IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

LEROY BRIMMER,

    Petitioner,

vs.

STEPHEN DOTSON,

    Respondent.

No. 09-1222-STA-egb

ORDER TO MODIFY THE DOCKET
ORDER ON PENDING MOTIONS
ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254
ORDER DENYING CERTIFICATE OF APPEALABILITY
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
ORDER DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

On October 8, 2009, Petitioner Leroy Brimmer, Tennessee
Department of Correction ("TDOC") prisoner number 394892, who is
currently an inmate at the Northwest Correctional Complex in
Tiptonville, Tennessee, filed a *pro se* petition pursuant to 28
U.S.C. § 2254 in the Eastern Division of this district, accompanied
by a motion seeking leave to proceed *in forma pauperis*. (ECF Nos.
1 & 2.)[1] Because Petitioner's *in forma pauperis* affidavit was
unsigned and the financial information was outdated, United States

_____

[1]     The docket incorrectly lists Petitioner's TDOC number as 393892. The
Clerk is directed to correct the docket to reflect his correct TDOC number and
to include the correct TDOC number on the envelope in which his copy of this
order is mailed.

District Judge J. Daniel Breen issued an order on November 12, 2009, directing Petitioner to file a properly completed *in forma pauperis* affidavit or pay the habeas filing fee. (ECF No. 3.) That order also transferred the petition to the Western Division of this district, where the convicting court is located, and directed the Clerk to reassign the case to a judge sitting in this division. (Id.)[2] Petitioner filed the required documents on December 7, 2009. (ECF No. 4.) In an order issued on January 8, 2010, the Court granted leave to proceed *in forma pauperis* and directed Respondent to file the state-court record and a response to the Petition. (ECF No. 5.)

On March 3, 2010, Respondent filed his Answer to the Petition (ECF No. 9) and a portion of the state-court record (ECF No. 10). Petitioner filed the remainder of the state-court record on March 9, 2010. (ECF No. 11.)[3]

On May 15, 2012, Petitioner filed a Rule 15(a)(2) Motion to Amend. (ECF No. 17.) Although the motion is difficult to decipher, Petitioner appears to be arguing that his procedural default of the ineffective assistance of appellate counsel claim should be excused on the basis of the Supreme Court's decision in Martinez v. Ryan, ___ U.S. ___, ___, 132 S. Ct. 1309, 1320, 182 L. Ed. 2d 272 (2012).

---

[2] The case was reassigned to this judge on November 16, 2009.

[3] Both the Answer and the state-court record were due on March 3, 2010. (ECF No. 8.) The Notice of Filing for the documents that accompanied the Answer stated that portions of the state-court record had not been received (ECF No. 10 at 1), but Respondent did not seek an additional extension of time. The Court will, *in this instance only*, excuse Respondent's late filing.

The purported new issues presented in this motion appear to be identical to the grounds that Petitioner wanted his appellate counsel to present. (*See* ECF No. 1-1 at 9-10.) Therefore, the motion for leave to amend is DENIED as unnecessary. The Court will consider the decision in <u>Martinez v. Ryan</u> when evaluating the ineffective assistance of appellate counsel claim.

On August 8, 2012, Petitioner filed a Motion to Compel or Serve Answer to Petitioner (ECF No. 18), in which he asserted that he had not received the Answer and asked for a copy of that filing.[4] On August 27, 2012, Respondent notified the Court that he mailed Petitioner a copy of the Answer upon receipt of the motion. (ECF No. 19.) On the basis of that representation, the Motion to Compel is DENIED as moot.

On September 7, 2012, Petitioner filed a Notice of Reply and Motion for Leave to Reply (ECF No. 20), which seeks leave to reply to the Answer. Petitioner did not include a copy of his proposed reply, and he also did not submit a reply during the months since the filing of this motion. Because Petitioner has had sufficient opportunity to reply, the Court declines to delay the disposition of this case for any longer. The motion is DENIED.

On September 7, 2012, Petitioner filed a second Motion to Appoint Counsel. (ECF No. 21.) The Court denied Petitioner's first

---

[4]    Petitioner must have lost his copy of the Answer, because the motion he filed on May 15, 2012 included an accurate reference to the contents of the Answer. (*See* ECF No. 17 at 2.)

motion for the appointment of counsel on July 29, 2011. (ECF No. 15.) The instant motion is DENIED for the reasons stated in the previous order.

On October 29, 2012, Petitioner filed a Motion for Leave to Withdraw and Substitute/Amend the Issue #-1. (ECF No. 22.) In that motion, Brimmer seeks to withdraw his first issue, which he says was mistakenly included by a legal assistant at his prior prison, and to substitute a new claim of sufficiency of the evidence. Brimmer's motion to withdraw his Claim 1 is GRANTED. Because the proposed amendment was not submitted on the official form, and because Brimmer was not reasonably diligent in discovering the alleged mistake in the Petition he submitted more than three years ago, leave to amend is DENIED.

## I.       STATE COURT PROCEDURAL HISTORY

On August 14, 2003, a grand jury sitting in Shelby County, Tennessee, returned a single-count indictment charging Brimmer with the first degree murder of Vicky Lee Covin on January 3, 2003.[5] On May 26, 2005, after a jury trial in the Shelby County Criminal Court, the jury returned a guilty verdict on the sole count of the indictment.[6] The trial judge sentenced Brimmer to life imprisonment with the possibility of parole.[7] The Tennessee Court of Criminal

---

[5]      Indictment, State v. Brimmer, No. 03-05597 (Shelby Cnty. Crim. Ct.), ECF No. 11-1 at 1-2.

[6]      Trial Tr. 307, id., ECF No. 11-1.

[7]      Trial Tr. 308, id., ECF No. 11-1; J., id., ECF No. 11-1 at 47.

4

Appeals affirmed. <u>State v. Brimmer</u>, No. W1999-01036-CCA-R3-CD, 2000 WL 1863515 (Tenn. Crim. App. Dec. 1, 2000), *appeal denied* (Tenn. Oct. 18, 2001).

On or about March 19, 2007, Brimmer filed a *pro se* petition pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122, in the Shelby County Criminal Court.[8] Counsel was appointed to represent Brimmer,[9] and an amended or supplemental petition was filed on August 9, 2007.[10] A post-conviction hearing was held on January 10, 2008,[11] and, on April 3, 2008, the post-conviction court denied the petition.[12] The Tennessee Court of Criminal Appeals affirmed. <u>Brimmer v. State</u>, No. W2008-00738-CCA-R3-PC, 2008 WL 5263433 (Tenn. Crim. App. Dec. 12, 2008), *appeal denied* (Tenn. Apr. 27, 2009).

The Tennessee Court of Criminal Appeals summarized the evidence introduced at trial:

> On January 3, 2003, the appellant shot and killed his forty-one-year-old estranged girlfriend, Vicky Covin. At trial, Teresa Perkins, the victim's sister, testified that the victim graduated from nursing school and started

---

[8]     Pet. for Post-Conviction Relief, <u>Brimmer v. State</u>, No. P-26688 (Shelby Cnty. Crim. Ct.), ECF No. 11-2 at 8-37.

[9]     Order Appointing Private Counsel to Represent Indigent Petitioner, <u>id.</u>, ECF No. 11-2 at 45.

[10]     Am./Suppl. Pet. for Post Conviction Relief, <u>id.</u>, ECF No. 11-2 at 46-49.

[11]     Pet. for Post-Conviction Relief Hr'g Tr., <u>id.</u>, ECF No. 11-2 at 67-135.

[12]     Order Denying Pet. for Post-Conviction Relief, <u>id.</u>, ECF No. 11-2 at 51-59.

a new job shortly before her death. Perkins and the victim had a close relationship, and the victim started dating the appellant in November 2000. Perkins and the appellant were friends and got along well. Perkins described the victim's and the appellant's relationship as "[u]p and down," and the couple would often break up and reconcile. In November 2002, the victim told Perkins that her relationship with the appellant was deteriorating. The victim denied that she was dating anyone else, but Perkins later learned the victim was dating Reginald Taylor. The victim asked the appellant to move out of her apartment. However, the appellant refused, and the victim moved out. On December 23, 2002, the victim telephoned Perkins and told her that the appellant had reported to the police that the victim had abandoned her children. The victim was mad, returned to her apartment, picked up her children, and left. On Christmas day, the appellant came to Perkins' home for dinner. He told Perkins that the victim had "done him wrong," that the victim was "running around," and that he was going to have to kill her. Perkins was concerned, but the appellant assured her that he was "just talking." The appellant told Perkins, "I ain't going to do nothing like that," and Perkins did not believe the appellant was going to harm the victim. That night, the victim and the police went to the victim's and the appellant's apartment, and the police made the appellant leave. On cross-examination, Perkins testified that the appellant was upset that the victim had broken up with him. She said that although the appellant was usually fun and talkative, he was mad, irrational, and "talking crazy" on Christmas Day.

Deflora Clark, the victim's neighbor, testified that about 5:30 a.m. on January 3, 2003, she was watching television and heard arguing outside. She looked out the window, saw the victim, and heard the victim say, "Leroy, please let me go to work. If I don't go to work I'm going to lose my job." The victim got into her truck, and the appellant was standing near the truck's passenger side. Clark heard a gunshot, telephoned 911, and opened her apartment door. She saw the reverse lights on the victim's truck come on and heard two more gunshots. The victim's truck backed up and hit a tree and a fence. The appellant walked around to the front of the truck, put a gun in his jacket pocket, and calmly walked away. Clark and her boyfriend ran to the victim's truck, and Clark saw that the victim was slumped over and bloody. She

heard a man in the victim's apartment yell that he was locked inside. Clark's boyfriend took the keys out of the truck's ignition and unlocked the victim's apartment door.

On cross-examination, Clark acknowledged that she told the police she did not recognize the person who shot the victim. However, she said that she was sure that the appellant was the gunman because the victim called him by name and because Clark saw him walk away from the victim's truck after the shooting. She said she got a clear look at the appellant and that he did not say anything to the victim before the shooting.

Reginald Taylor testified that he and the victim had been living together for two or three weeks at the time of the shooting. Taylor met the victim on Thanksgiving Day in 2002, and they became romantically involved two or three days later. On December 26, 2002, Taylor moved into the victim's apartment. On the morning of January 3, 2003, the victim got ready for work and left. Taylor heard a gunshot and heard the victim say, "Leroy, please let me go." Taylor started getting dressed, heard another gunshot, and tried to get out of the apartment by kicking the door. A neighbor unlocked the door and let Taylor out of the apartment. He said that while he and the victim were dating, the appellant would call his cellular telephone and threaten to kill him and the victim. He said that the appellant also harassed them and left threatening messages on his telephone's voice mail. On cross-examination, Taylor testified that he consumed alcohol the night before the shooting, but he denied drinking alcohol before testifying at the appellant's trial. He said that he never threatened the appellant, that he never saw the victim telephone the appellant, and that he did not hear the appellant say anything to the victim before the shooting. Just before the appellant shot the victim, Taylor looked out a window and saw the appellant chase the victim around her truck. He acknowledged having three prior convictions for forgery.

Deputy Kimberly Trippett, who was assigned to the Fugitive Squad of the Sheriff's Office, testified that on the morning of January 3, 2003, the appellant came into the office, stated that he wanted to turn himself in, and stated that he had shot his girlfriend. Deputy Trippett patted down the appellant, and the appellant told her

that he had left a weapon in his car. The Memphis Police Department was then notified of the crime.

Sergeant Eric Freeman of the Memphis Police Department testified that he collected evidence from the appellant's car on January 3. Sergeant Trippett found a .38 Special handgun on the front passenger seat. The gun contained three spent shells and three live rounds.

Officer Joe Stark of the Memphis Police Department testified that he and another officer interviewed the appellant on the day of the shooting. Officer Stark read the appellant his rights, and the appellant signed a waiver of rights form. The appellant wanted to talk to the police and was very responsive to the officers' questions. He did not appear to be under the influence of alcohol or drugs and gave a statement. In the statement, the appellant said the following: The appellant went to the victim's apartment in order to talk to her and get some answers. After he confronted the victim, he fired a warning shot into the air. The victim got into her truck and backed up the vehicle, and the appellant shot out the passenger side window. The appellant did not see any blood and fired the gun again. The appellant had not planned on shooting the victim but took the gun with him to the victim's apartment because he was afraid of the victim's new boyfriend and wanted to shoot him. Instead of shooting Reginald Taylor, the appellant shot the victim because she was mistreating him, was taking his money, and was spending his money on Taylor. In his statement, the appellant said that "the gun went off" and that the victim was responsible for her own death. On cross-examination, Officer Stark acknowledged that the appellant was very cooperative but upset. The appellant never told the officer that he had planned to kill the victim. Officer Stark said that the appellant was angry but that his anger appeared to be directed at the victim's boyfriend, not the victim. Officer Stark acknowledged that he may have asked the appellant if this was a heat-of-passion case.

Dr. O.C. Smith testified that he performed the victim's autopsy. The victim had two gunshot wounds, one to the right shoulder and one to the neck. The bullet which struck the shoulder traveled downward and to the left. It tore open the victim's axillary artery, which pushes blood into the arm. The bullet traveled into the victim's chest, damaged her right lung, fractured some

ribs, and lodged in the skin on her back. As to the neck wound, the bullet entered the right side of the neck, where it damaged some muscles and hit some spinal bones. Dr. Smith classified the wound to the neck as a flesh wound. He said that he found no powder burns on the victim's body, indicating that the appellant fired the gun at least twenty-four inches away from the victim or that the bullets traveled through an intermediate source before they entered the victim. He said that the victim survived for about two hours after the shooting and that she died from blood loss and an inability to breathe.

Tomeka Davis testified for the appellant that she and the victim attended nursing school together and became friends. On Thanksgiving Day in 2002, the victim came to Davis' home, where she met Davis' brother-in-law, Reginald Taylor, for the first time. About one week later, the victim told Davis that she and Taylor had been seeing each other. On the night of December 25, 2002, the appellant telephoned Davis and told her that he was being forced to move out of his and the victim's apartment. At some point, Taylor moved in with the victim. Davis continued to have conversations with the appellant, and the appellant told Davis that the victim had been calling him and taunting him about their breakup.

David Brimmer, the appellant's brother, testified that the appellant was "head over heels" for the victim, that the couple was happy at beginning [sic] of their relationship, and that the appellant put the victim "above everything." Toward the end of 2002, David Brimmer learned the victim was having an affair. He said that he talked with the appellant and that the appellant was depressed and very upset. He said that the appellant's state of mind changed and that the appellant was confused. The appellant told Brimmer that he would not hurt the victim, and Brimmer was surprised about the shooting.

The appellant testified that he was the victim's fiancé, that they had been in a relationship for about five years, and that he paid for the victim to go to nursing school. While the victim was in school, the appellant paid their bills and bought clothes for the victim's two minor children, who lived with them. In December 2002, the victim's behavior changed, and the appellant learned she was having an affair. A few days before Christmas, the victim left the appellant and her

children and would not return to their home. The appellant telephoned the police and told them to pick up the victim's children because he had to go to work. On the night of December 25, 2002, the victim had the appellant kicked out of their apartment. After that, the appellant was not himself. He said that the victim and Taylor telephoned him and were involved in sexual behavior over the telephone. The victim never told the appellant that their relationship was over, and the appellant tried to talk to her. However, the victim would not talk to him. On the night before the shooting, the appellant had a dream and woke up sweating. He drove to the victim's apartment, parked across the street, walked to the apartment, and waited for the victim to come outside. The appellant stated that he was wondering "who is this guy, you know, she done throwed up in my face."

The victim came outside and locked her apartment door. The appellant approached the victim and asked if he could talk to her. The victim began yelling and ran around her truck. The appellant asked the victim where Reginald Taylor was, and the victim told the appellant, "He ain't did nothing." The appellant said that his mind "just snapped," that he pulled out the gun, and that he started shooting. He said that he fired four shots and that he fired the first shot into the air. The victim got into her truck, and the appellant shot into the vehicle. He said that he always carried a gun on his person and that he was not trying to shoot the victim. He said that the victim knocked the truck out of gear, that the truck rolled backward, and that he did not know he had shot the victim. He walked away from scene [sic] and immediately drove to the police department. The appellant voluntarily confessed to police and told them that he thought he had shot his fiancé. The appellant testified that he shot the victim because he had gone into a rage, that he felt awful about the shooting, and that he loved the victim. On cross-examination, the appellant testified that he did not like the way the victim had treated him and that he was "deranged." On the morning of the shooting, the appellant waited about fifteen minutes for the victim to come out of her apartment. When he confronted her, she told him that Taylor had not done anything. The appellant acknowledged that the victim's trying to protect Taylor angered him. The jury convicted the appellant of first degree premeditated murder.

<u>State v. Brimmer</u>, No. W2005-01932-CCA-R3-CD, 2006 WL 1205625, at
*1-4.

## II.      PETITIONER'S FEDERAL HABEAS CLAIMS

In his federal habeas petition, Brimmer raises the following
issues:

1. Whether the trial court improperly charged the
   jury;

2. Whether he was denied the effective assistance of
   trial counsel; and

3. Whether he was denied the effective assistance of
   appellate counsel.

(ECF No. 1 at 5-10; ECF No. 1-1 at 2-10.) Brimmer has withdrawn his
first issue. *See supra* p. 4.

## III.      THE LEGAL STANDARD

The statutory authority for federal courts to grant habeas
corpus relief for persons in state custody is provided by 28 U.S.C.
§ 2254, as amended by the Antiterrorism and Effective Death Penalty
Act of 1996 ("AEDPA"). A federal court may grant habeas relief to
a state prisoner "only on the ground that he is in custody in
violation of the Constitution or laws or treaties of the United
States." 28 U.S.C. § 2254(a).

### A.    Waiver and Procedural Default

Twenty-eight U.S.C. §§ 2254(b) and (c) provide that a federal
court may not grant a writ of habeas corpus on behalf of a state
prisoner unless, with certain exceptions, the prisoner has
exhausted available state remedies by presenting the same claim

11

sought to be redressed in a federal habeas court to the state courts. <u>Cullen v. Pinholster</u>, \_\_\_ U.S. \_\_\_, \_\_\_, 131 S. Ct. 1388, 1398, 79 L. Ed. 2d 557 (2011). The petitioner must "fairly present"[13] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, <u>Baldwin v. Reese</u>, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349, 158 L. Ed. 2d 64 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, <u>O'Sullivan v. Boerckel</u>, 526 U.S. 837, 847-48, 119 S. Ct. 1728, 1733-34, 144 L. Ed. 2d 1 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies." <u>Adams v. Holland</u>, 330 F.3d 398, 402 (6th Cir. 2003); <i>see</i> <u>Smith v. Morgan</u>, 371 F. App'x 575, 579 (6th Cir. 2010) (the <u>Adams</u> holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes that court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

---

[13]    For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (per curiam). Nor is it enough to make a general appeal to a broad constitutional guarantee. <u>Gray v. Netherland</u>, 518 U.S. 152, 163, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See* Edwards v. Carpenter, 529 U.S. 446, 452-53, 120 S. Ct. 1587, 1592, 146 L. Ed. 2d 518 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88, 97 S. Ct. 2497, 2506-07, 52 L. Ed. 2d 594 (1977); *see* Coleman v. Thompson, 501 U.S. 722, 729-30, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 732, 111 S. Ct. at 2555; *see* Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or,

alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. <u>Schlup v. Delo</u>, 513 U.S. 298, 322, 115 S. Ct. 851, 864, 130 L. Ed. 2d 808 (1995); <u>Coleman</u>, 501 U.S. at 750, 111 S. Ct. at 2565. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. <u>Schlup</u>, 513 U.S. at 321, 115 S. Ct. at 864; *see* <u>House v. Bell</u>, 547 U.S. 518, 536-39, 126 S. Ct. 2064, 2076-78, 165 L. Ed. 2d 1 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

### B. Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the

benefit of the doubt." <u>Cullen</u>, ___ U.S. at ___, 131 S. Ct. at 1398 (internal quotation marks and citations omitted).[14]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. <u>Cullen</u>, ___ U.S. at ___, 131 S. Ct. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).[15] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 412-13, 120 S. Ct. at 1523. The state court's application of clearly established federal law must be "objectively unreasonable." <u>Id.</u> at 409, 120 S. Ct. at 1521. The writ may not issue merely because the habeas court, in its independent judgment,

---

[14]    The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a <i>de novo</i> review of whether the state court's determination was incorrect. <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007).

[15]    The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (per curiam); <i>see</i> <u>Mitchell v. Esparza</u>, 540 U.S. 12, 16, 124 S. Ct. 7, 10, 157 L. Ed. 2d 263 (2003) (same); <u>Treesh v. Bagley</u>, 612 F.3d 424, 429 (6th Cir. 2010) (same), <i>cert. denied</i>, ___ U.S. ___, 131 S. Ct. 1678, 179 L. Ed. 2d 622 (2011).

determines that the state court decision applied clearly established federal law erroneously or incorrectly. <u>Renico v. Lett</u>, 559 U.S. 766, ___, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010); <u>Williams</u>, 529 U.S. at 411, 129 S. Ct. at 1522.

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in <u>Wood v. Allen</u>, 558 U.S. 290, ___, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In <u>Rice v. Collins</u>, 546 U.S. 333, 341-42, 126 S. Ct. 969, 976, 163 L. Ed. 2d 824 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[16]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" <u>Harris v. Haeberlin</u>, 526 F.3d 903, 910 (6th Cir. 2008) (quoting <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240, 125 S.

---

[16]    In <u>Wood</u>, 120 S. Ct. at 845, 848, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Court ultimately found it unnecessary to reach that issue. <u>Id.</u> at 849, 851. In <u>Rice</u>, 546 U.S. at 339, 126 S. Ct. at 974, the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable.

Ct. 2317, 2325, 162 L. Ed. 2d 196 (2005)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. <u>Ayers v. Hudson</u>, 623 F.3d 301, 308 (6th Cir. 2010); *see* <u>Hudson v. Lafler</u>, 421 F. App'x 619, 624 (6th Cir. 2011) (same), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1085, 181 L. Ed. 2d 803 (2012).

**IV.      ANALYSIS OF PETITIONER'S CLAIMS**

**A.   Ineffective Assistance of Trial Counsel (Claim 2)**

In his second issue, Brimmer contends that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment. (ECF No. 1 at 7-8; ECF No. 1-1 at 5-8.) The Petition and accompanying legal memorandum provide few facts to support this issue. The Petition says only that "had it been for the said counsel's ineffectives [sic], the Petitioner would have had a different result (verdict)." (ECF No. 1 at 7.) The legal memorandum refers to a guilty plea (ECF No. 1-1 at 2, 5), although no plea was entered in this case. The memorandum asserts that

> defense counsel did not confer with the Petitioner to
> gather information with which to attack the prosecution's
> case, either through material evidence, statements, or by
> motions. Defense counsel did not search for a possible
> violation of the Petitioner's Constitutional Rights, be
> it in the actual arrest, a deficient indictment, etc. The

> Petitioner's said counsel did not confer with the
> Petitioner to get the Petitioner's [possible] alibi
> witnesses. McBee[.]

(Id. at 5 (emphasis omitted).) The legal memorandum also states

that

> counsel failed to investigate, counsel failed to call
> upon witness that would testify to the events that had
> taken place, counsel failed to object to State's witness
> when it was made clear that the State's witness was
> testifying to hearsay. Petitioner's counsel failed to
> present evidence that proved the Petitioner, at the time
> of trial did not voluntarily waive to self incriminate
> himself.

(Id. at 7-8.)

Brimmer raised a claim that his trial counsel was ineffective

in his post-conviction petition. The following evidence was

introduced on that claim at the post-conviction hearing:

> The petitioner filed a *pro se* petition for post-
> conviction relief on March 19, 2007, and, following the
> appointment of counsel, an amended petition on August 9,
> 2007, raising claims of ineffective assistance of trial
> and appellate counsel. At the evidentiary hearing,
> however, he abandoned his claim of ineffective assistance
> of appellate counsel, focusing instead on alleged
> deficiencies in trial counsel's performance.
> Specifically, he argued that trial counsel was
> ineffective for failing to investigate the effect the
> petitioner's medication had on his cognitive functioning,
> for failing to visit with him a sufficient number of
> times in order to prepare an adequate defense, and for
> failing to explain the ramifications of the petitioner's
> testifying in his own defense.

> At the evidentiary hearing, the petitioner testified
> that he was represented at trial by two public defenders:
> senior trial counsel, who took over his case early in the
> pretrial process, and junior trial counsel, who was
> assigned to assist senior counsel shortly before the
> trial date. He complained that senior trial counsel did
> not consult with him very much, coming to see him in the

jail only once every six months or so for twenty or thirty minutes at a time and visiting with him only once or twice in the courtroom. He said he both wrote and telephoned counsel a number of times but received only one or two letters in return and was able to speak to him only once. Furthermore, even when he was able to speak with counsel, he was unable to understand him or communicate effectively with him. The petitioner explained that he had had a "nervous ... breakdown" and was on psychotropic medications, including Prozac, Risperdal, and Trazodone, from the first day he arrived at the jail until after his trial. He said the medications kept him sedated and seriously impaired his ability to recall information, including the events that led to his conviction. He thought he told counsel about the effect the medications were having on him, but he could not be certain.

The petitioner testified that when he asked senior trial counsel if his testifying at trial would hurt his case, counsel reassured him he would do fine. Counsel did not, however, explain his Fifth Amendment rights to him, and he did not recall his having ever discussed the details of his testimony. The petitioner said that counsel also failed to discuss any defense strategy with him and that he was under the impression that they were unprepared for trial. He stated that he told senior trial counsel about two witnesses he wanted to testify in his defense: Jennifer Ray and Kela Lee. Counsel, however, informed him that Ray, the victim's daughter, wanted nothing to do with the defense and that his investigator had been unable to locate Lee.

On cross-examination, the petitioner acknowledged that he received a mental evaluation prior to trial but said he thought the examiner treated it as "a joke." He insisted that trial counsel never explained the risks versus benefits of his testifying at trial and stated that had he known that his sedated state, caused by his medications, would allow the prosecutor to "chew [him] up like he did," he would not have taken the stand only to incriminate himself.

Senior trial counsel testified that he had been employed as an assistant public defender with the Shelby County Public Defender's Office since 1998. He said he was first assigned to the case upon the petitioner's arraignment in criminal court, which he believed occurred

on October 1, 2003. His records reflected that during the course of his representation he met with the petitioner eleven times in jail, including three times in the week preceding trial, and on fifteen report dates, including some in which they engaged in lengthy discussions. He discussed with the petitioner, among other things, the facts of the case, the nature of the offense, the range of punishment, possible defenses and witnesses, and the pros and cons of the petitioner's testifying in his own defense. The petitioner always appeared to understand him and actively engaged in dialogue with him about the case. The petitioner never gave any indication of mental impairment and said, when asked, that he had no history of mental illness. Nevertheless, as a precaution, trial counsel arranged for him to receive a mental evaluation, which resulted in the petitioner's being found competent, "not committable," and "able to confer and cooperate with defense counsel."

Trial counsel testified that he had many conversations with the petitioner about the advantages and pitfalls of testifying. He stated that the petitioner had given a very damaging statement to police in which he admitted to having purchased the murder weapon nine days before the shooting and having lain in wait outside the victim's residence on the morning of the shooting. Because the petitioner had no criminal record and therefore could not be impeached with any prior convictions, counsel informed him that the best way for him to explain his state of mind at the time of the shooting was to take the stand in his own defense. At the same time, however, he warned him that if he chose to testify, he would face vigorous cross-examination by a "seasoned veteran prosecutor":

> [W]e told [the petitioner] ... if he cho[se] to testify that he would be vigorously cross-examined. But his story always stood the same. He never wavered in his story and as long as he was able to get that out there that, you know, that testifying would have its pitfalls but we could get something out of it. And being that this really was a state of mind case, not really a factual dispute or an identity case, to get into [the petitioner's] state of mind it would be advantageous for him to testify.

Trial counsel testified that the petitioner "was voir dired prior to testifying in open court on the record before we put him on the stand.... And like I said, [the trial judge] did voir dire him prior to him taking the stand in a jury-out hearing, a voir dire right before we put our proof on."

Trial counsel testified that he and co-counsel were fully prepared to try the case on the day of trial. He had contacted Jennifer Ray, who made it clear that she wanted nothing to do with the defense, and his investigator had twice interviewed Kela Lee, who was Ray's boyfriend at the time of the shooting. According to trial counsel, Lee was going to provide testimony about the relationship between the petitioner and the victim, particularly with respect to how the victim "had done [the petitioner] wrong" by cheating on him after he had supported her and put her through nursing school. However, neither the sheriff's department nor counsel's investigator was able to locate Lee for service of process at the time of trial. Nonetheless, trial counsel believed that he was able to elicit similar information through the cross-examination testimony of the victim's sister and the direct examination testimony of the petitioner's brother. He said that he disclosed to the petitioner prior to trial that he was unable to obtain service on Lee and offered to ask for a continuance, but the petitioner informed him that he was comfortable with proceeding with the witnesses they had.

Brimmer v. State, 20008 WL 5263433, at *1-3.

A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. "A court considering a claim of ineffective assistance must apply a 'strong

presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [<u>Strickland</u>, 466 U.S.] at 689, 104 S. Ct. 2052. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' <u>Id.</u>, at 687, 104 S. Ct. 2052." <u>Harrington v. Richter</u>, ___ U.S. ___, ___, 131 S. Ct. 770, 787, 178 L. Ed. 2d 624 (2011).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. at 2068.[17] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694, 104 S. Ct. at 2068. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [<u>Srickland</u>, 466 U.S.] at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' <u>Id.</u>, at 687, 104 S. Ct. 2052." <u>Richter</u>, ___ U.S. at ___, 131 S. Ct. at 787-88; *see also* <u>id.</u> at ___, 131 S. Ct. at 791-72 ("In assessing prejudice under <u>Strickland</u>, the question is not whether a court can be certain counsel's performance had no effect on the outcome or

---

[17]    "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." <u>Id.</u> at 697, 104 S. Ct. at 2069. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. <u>Id.</u> at 697, 104 S. Ct. at 2069.

whether it is possible a reasonable doubt might have been
established if counsel acted differently. . . . The likelihood of
a different result must be substantial, not just conceivable.")
(citations omitted); <u>Wong v. Belmontes</u>, 558 U.S. at 15, __, 130 S.
Ct. 383, 391-92, 175 L. Ed. 2d 328 (2009) (per curiam) ("But
<u>Strickland</u> does not require the State to 'rule out' [a more
favorable outcome] to prevail. Rather, <u>Strickland</u> places the burden
on the defendant, not the State, to show a 'reasonable probability'
that the result would have been different.").

"Surmounting <u>Strickland</u>'s high bar is never an easy task."
<u>Padilla v. Ky.</u>, 559 U.S. 356, ___, 130 S. Ct. 1473, 1385 (2010).

> An ineffective-assistance claim can function as a way to
> escape rules of waiver and forfeiture and raise issues
> not presented at trial, and so the <u>Strickland</u> standard
> must be applied with scrupulous care, lest "intrusive
> post-trial inquiry" threaten the integrity of the very
> adversary process the right to counsel is meant to serve.
> <u>Strickland</u>, 466 U.S., at 689-690, 104 S. Ct. 2052. Even
> under *de novo* review, the standard for judging counsel's
> representation is a most deferential one. Unlike a later
> reviewing court, the attorney observed the relevant
> proceedings, knew of materials outside the record, and
> interacted with the client, with opposing counsel, and
> with the judge. It is "all too tempting" to "second-guess
> counsel's assistance after conviction or adverse
> sentence." <u>Id.</u>, at 689, 104 S. Ct. 2052; *see also* <u>Bell v.
> Cone</u>, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d
> 914 (2002); <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372, 113
> S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is
> whether an attorney's representation amounted to
> incompetence under "prevailing professional norms," not
> whether it deviated from best practices or most common
> custom. <u>Strickland</u>, 466 U.S., at 690, 104 S. Ct. 2052.

<u>Richter</u>, ___ U.S. at ___, 131 S. Ct. at 788.

When an ineffective assistance claim is reviewed under §
2254(d), the review is "doubly deferential." <u>Knowles v. Mirzayance</u>,
556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009).

> Establishing that a state court's application of
> <u>Strickland</u> was unreasonable under § 2254(d) is all the
> more difficult. The standards created by <u>Strickland</u> and
> § 2254(d) are both "highly deferential," <u>id.</u>, at 689, 104
> S. Ct. 2052; <u>Lindh v. Murphy</u>, 521 U.S. 320, 333, n. 7,
> 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the
> two apply in tandem, review is "doubly" so, <u>Knowles</u>, 556
> U.S., at ----, 129 S. Ct. at 1420. The <u>Strickland</u>
> standard is a general one, so the range of reasonable
> applications is substantial. 556 U.S., at ----, 129 S.
> Ct. at 1420. Federal habeas courts must guard against the
> danger of equating unreasonableness under <u>Strickland</u> with
> unreasonableness under § 2254(d). When § 2254(d) applies,
> the question is not whether counsel's actions were
> reasonable. The question is whether there is any
> reasonable argument that counsel satisfied <u>Strickland</u>'s
> deferential standard.

<u>Richter</u>, ___ U.S. at ___, 131 S. Ct. at 788.

The Tennessee Court of Criminal Appeals rejected Brimmer's
ineffective assistance claim on the merits, stating as follows:

> To establish a claim of ineffective assistance of
> counsel, the petitioner has the burden to show both that
> trial counsel's performance was deficient and that
> counsel's deficient performance prejudiced the outcome of
> the proceeding. <u>Strickland v. Washington</u>, 466 U.S. 668,
> 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); *see*
> <u>State v. Taylor</u>, 968 S.W.2d 900, 905 (Tenn. Crim. App.
> 1997) (noting that same standard for determining
> ineffective assistance of counsel that is applied in
> federal cases also applies in Tennessee). The <u>Strickland</u>
> standard is a two-prong test:
>
> > First, the defendant must show that counsel's
> > performance was deficient. This requires showing
> > that counsel made errors so serious that counsel
> > was not functioning as the "counsel" guaranteed the
> > defendant by the Sixth Amendment. Second, the
> > defendant must show that the deficient performance

prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.,* a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

. . . .

The petitioner contends on appeal that trial counsel was deficient for failing to meet with him a sufficient amount of time in order to prepare an adequate defense; for failing to investigate his mental health issues, including the psychotropic medication that impacted his ability to understand the charge against him or to participate meaningfully in his own defense; and for failing to explain the benefits and consequences of his testifying at trial. The petitioner further contends that these alleged deficiencies in counsel's representation prejudiced the outcome of his trial. Specifically, with respect to his last allegation of deficiency of counsel, the petitioner argues that had he been better informed about the risks of testifying, he would not have chosen to testify because he believed his testimony helped incriminate him. The State argues that the post-conviction court properly concluded that the petitioner received effective assistance of trial counsel. We agree with the State.

In denying relief on these claims, the post-conviction court accredited the testimony of trial counsel over that of the petitioner, noting that while the petitioner testified that his medications impaired his memory of meetings, trial counsel had records to

support his account of the numerous meetings and discussions he held with the petitioner. The post-conviction court further noted that trial counsel's testimony that he informed the petitioner of the risks versus benefits of testifying in his own defense was corroborated by the petitioner's own testimony during voir dire by the trial court, in which he clearly stated that he was not on any medication that impaired his ability to understand, that he understood his Fifth Amendment rights and the pros and cons of testifying, and that it was his decision to testify. Finally, the post-conviction court found that trial counsel was not deficient for failing to call a witness who would have been hostile to the defense and one who could not be located, and that the petitioner failed to show any prejudice as a result of counsel's failure to call these witnesses. Accordingly, the court concluded that the petitioner had failed to meet his burden of proving his allegations by clear and convincing evidence.

The record fully supports the findings and conclusions of the post-conviction court. Trial counsel's testimony established that he met numerous times with the petitioner and fully discussed the case, including possible defenses, witnesses, and the advantages and disadvantages of the petitioner's testifying. Trial counsel questioned the petitioner directly about whether he had any mental illness and was assured by the petitioner that he did not. In addition, trial counsel had the petitioner mentally evaluated, with the result that he was found competent to stand trial and had no mental issues that would affect his defense. The petitioner has simply failed to show any deficiencies in counsel's representation or that he suffered any prejudice as a result of counsel's alleged deficiencies.

Brimmer v. State, 2008 WL 5263433, at *3-5.

Because Brimmer's legal memorandum does not clearly address the standards for evaluating habeas claims on the merits, it is unclear whether he contends that the decision of the Tennessee Court of Criminal Appeals on this issue was "contrary to, or involved an unreasonable application of clearly established Federal

law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or whether it "was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding," id. § 2254(d)(2).

Brimmer makes no argument that the decision of the Tennessee Court of Criminal Appeals was contrary to Strickland. This is "a run-of-the-mill state-court decision applying the correct legal rule from [Strickland v. Washington] to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor, 529 U.S. at 406.[18]

It is not clear whether Brimmer contends that the decision of the Tennessee Court of Criminal Appeals was an unreasonable application of Strickland. Although it can be inferred that Brimmer disagrees with the state-court decision, his petition does not analyze any particular deficiencies in the decision in light of Strickland. Brimmer also makes no effort to demonstrate that the state-court decision is objectively unreasonable, rather than merely incorrect. Williams, 529 U.S. at 410; see also supra pp. 15-16. The Tennessee Court of Criminal Appeals cited the correct legal

---

[18]    The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Id. at 406, 120 S. Ct. at 1520; see also id. at 407, 120 S. Ct. at 1520 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

standard, *see supra* pp. 24-25, and applied that standard to the evidence presented at the post-conviction hearing and at trial.

Brimmer presumably contends that the decision of the Tennessee Court of Criminal Appeals was based on an unreasonable determination of the facts. He has failed to establish that the factual conclusions of the Tennessee Court of Criminal Appeals are objectively unreasonable. Those factual conclusions are fully supported by the trial record and by the evidence introduced at the post-conviction hearing. At the post-conviction hearing, Brimmer testified that he turned himself in to police on January 3, 2003.[19] At that time, Brimmer voluntarily gave a full confession that included each of the elements of first degree murder.[20] The highlights of that confession include the following:

> **Q. On Friday, January 03, 2003 Vickey Covin was shot at 3040 St. Croix and later died from her injuries, are you responsible for her death?**
>
> **A. No she is responsible for her own death.**
>
> Q. Did you shoot Vickey Covin?
>
> A. I don't know, I just know the gun went off.
>
> Q. How do you know Vickey Covin and for how long?
>
> A. She was my fiancée, I've known her for about 4 or 5 years.
>
> Q. Did you have a weapon?

---

[19]     Pet. for Post-Conviction Relief Hr'g Tr. 9-10, <u>Brimmer v. State</u>, No. P-26688 (Shelby Cnty. Crim. Ct.), ECF No. 11-2.

[20]     *See* ECF No. 11-1 at 65-69.

A.    Yes.

Q.    What type was it?

A.    A 38 revolver, it was a Colt.

Q.    Where is this weapon now?

A.    I left it laying in my car.

Q.    What kind of car did you leave your weapon in and where is it now?

A.    I left it in front of the police department, 79 Buick LaSabre.

Q.    What time was it when you saw Vickey Covin and where was she?

A.    Today about 5:30 a quarter to six coming out of the house.

**Q.    Where were you before she came out of the house?**

**A.    Standing in an old house across the street.**

**Q.    Why did you not go to the house and knock on the door instead of standing in the house across the street?**

**A.    I knew she would go ahead and call the police.**

Q.    While you were waiting inside the house where was the weapon?

A.    It was on me in my pants.

Q.    At what point did you pull the weapon out?

A.    When she started yelling.

.  .  .  .

**Q.    How long had you been standing in the old house across the street before Ms. Covin came out of her house?**

**A.    About thirty minutes to an hour.**

Q.   While you were standing in the old house across the street were you planning to shoot or kill anyone?

A.   No, I just wanted her to talk to me and get some answers.

Q.   Why did you feel the need to bring a gun with you?

A.   Her boyfriend threaten to kill me and her daughter.

Q.   In your own words explain what happen before, during, and after the shooting?

A.   I woke up this morning and I felt something was going on inside me. I got in my car and left the hotel and drove over to Whitney and parked my car. I walked down the street and went inside the old house across from the house. The light came on in the house and I seen some guy go to the garbage can.

The next few minutes she came out then I walked up to her and I asked her why are you hurting me like this. You know I love you and I want to know why are you doing me like this. She went to screaming and hollering and she start running around the car. I told her to stop running from me, because I love you and I'm not going to hurt you, all I want you to do is talk to me. I asked her where that nigga was at, and she said I was going to call you when I got off of work. **If I had known he was in there I would have taken the key from her and shot him first and wouldn't have hurt her.**

Then she kept running and hollering, I told her to shut up and she wouldn't calm down so I shot the gun in the air. Then she ran back around to the other side of the car and got in the car. I asked her not to crank the car and she went to hollering about I was going to call you and I didn't hurt you, I didn't mean to hurt you. Then she started backing out, I shot at the car and shot the window out the car. **I didn't see any blood so I shot again.** She just laid her head back and the car just backed out the driveway by herself.

. . . .

Q.   Where was Ms. Covin struck when you fired your weapon?

A.   I don't know.

Q.   Who is Ms. Covin seeing now?

A.   Some guy named Reggie Black.

**Q.   Was it your intention to shot [sic] or kill Reggie Black?**

**A.   Yes, I wanted to get him, but I don't know if I would have or not.**

Q.   Why did you shot [sic] Ms. Covin?

A.   Because she was mistreating me, taking my money and buying this bum clothes and stuff, and took my jogging suit and gave it to him. There is no telling how much and [sic] money she had spent on him that I worked hard for.

. . . .

**Q.   Where did you get this weapon from that you shot Ms. Covin with and how long have you had it?**

**A.   I bought it off the streets on Christmas Day.**

**Q.   When you bought this weapon what were your intentions?**

**A.   I wanted to catch him in her truck that I was paying for.**

**Q.   What were you going to do when you caught him in the truck?**

**A.   I was going to shoot his ass.**[21]

In light of that confession, which defense counsel tried to have suppressed, there was probably very little likelihood that the

---

[21]     Id. at 66-68 (emphasis added).

outcome of the trial would have been different no matter what defense counsel did.

Brimmer was represented by Assistant Public Defenders Cliff Abeles and Amy Maynes.[22] The testimony of Abeles, which the state courts credited over that of Brimmer, reflects that he visited with Brimmer on numerous occasions:

> Well I did keep very good records of Mr. Brimmer's case. And prior to trial I had documented eleven jail visits up till trial. And at least three the week preceding trial to discuss the case. On as far as report dates I counted up to fifteen report dates that he had in Division 9. I can't say that we sat and talked a lot during the report dates but on certain report dates we certainly had lengthy discussions, other report dates not so lengthy because we had more of our lengthy discussions about his case in the jail.[23]

Abeles explained that most of his discussions with Brimmer occurred at the jail because "we would be discussing the facts in his case, possible defenses, witnesses, testifying, what the charges carried, the nature of the offense, range of punishment, everything that as a criminal defense attorney I would be required to do.[24]

Abeles also testified that Brimmer was able to understand him and participate in his defense despite any medications he may have been taking. According to Abeles,

> Mr. Brimmer's demeanor is [sic] very similar to what it is here today. We had dialog back and forth as to the

---

[22]     Pet. for Post-Conviction Relief Hr'g Tr. 10, Brimmer v. State, No. P-26688 (Shelby Cnty. Crim. Ct.), ECF No. 11-2.

[23]     Id. at 41.

[24]     Id. at 42.

actually to the case, the facts of the case, the facts
and circumstances surrounding the events for which he was
brought to court and indictment. I had very little
problems discussing the case back and forth with him.[25]

Abeles was asked whether Brimmer told him that he was on

medication, and he responded:

> I think I might have recalled that he, as many of my
> clients have been, was actually on medication but that
> did not seem to effect his ability to understand.
> Probably one of my very first lengthy interviews with him
> I had asked him if he had any history of mental illness
> that we could look at and he indicated he had no history
> of any mental illness. But as a precaution later on
> during my representation I did in fact order a mental
> evaluation through Midtown Mental Health.[26]

Brimmer was evaluated by Dr. John Hudson, who concluded that "he

was competent and not commitable and that he understood the nature

of the offense and was able to confer and cooperate with defense

counsel . . . ."[27]

Although Brimmer's testimony at the post-conviction hearing

differed from that of his attorney, the questioning by the post-

conviction court on this subject is revealing:

> Q.   Mr. Brimmer, how can you remember how many
> times the lawyers came to see you if you can't remember
> anything?
>
> A.   I didn't say I remember all the times he came
> to see me. I said I didn't remember him coming to speak
> to me, collaborate with me on my defense half. Only thing
> he would come and ask me a little, a few little questions
> and then that would be it, then I wouldn't see him no

---

more. Because they held my — they held me in that jail for almost three years.

Q.    I understand that. My question to you is how do you — how can you remember how many times they came to see you if you were under these medications and you were asleep all of the time?

A.    I don't know, it just came back to me as far as if, you know, I'm messed up now. I need to try to get myself out of here.

Q.    It just came back to you?

A.    Because it's hurting. Yes, sir, it's coming.

Q.    Is that what you're saying?

A.    Yes, sir.

Q.    When did it come back to you?

A.    I been thinking about it every day since I've been locked up, the whole time I've been locked up.

Q.    The entire time you are locked up you've been thinking about it?

A.    Yes, sir. Yes, sir. And then after I got off the medication a lot of things that I didn't think about I thinks about now.

      . . . .

Q.    So it's things that you didn't think about back then you think about them now?

A.    Right. Right. I can remember them now.

Q.    And those things that you didn't think about back then you didn't tell your lawyer about them, did you?

A.    Right. Right.

Q.    So there's really no way that your lawyer could do anything about that because you didn't tell your lawyer about it, isn't that right?

A.    Well, I thought I had told him some things but —

Q.    Well, which is it, did you tell him or not?

A.    I told him some and then I didn't, I didn't tell him all everything.

Q.    All right. You didn't tell him everything.

A.    Right.

Q.    But you did meet with him enough to tell him those things, didn't you?

A.    No, I did not.

Q.    You didn't meet with him enough?

A.    No. No, sir.

Q.    In all, how many times did you meet with them?

A.    I can't really say how many times because I can't — I didn't never write them down because, like I say, I was so sedated all the time. And then I was, like I say, I think I was going through a nervous breakdown thing or something like that because you know I hadn't never been in no trouble like that before.[28]

The state courts also credited the testimony of defense counsel that he discussed at length with Brimmer whether he should testify:

We had many conversations about testifying. One of the problems with it our case from the get go was his highly incriminating statement that he gave. And in order to sort of explain what he meant by some of the things and again to his state of mind, we discussed that the best way to probably do that was actually have him testify. But by doing so we also, you know, warned him of some of the pitfalls.

---

[28]    _Id._ at 34-37; _see also_ _id._ at 29 (Brimmer testified it was not possible his attorney came to see him more times that he remembered).

35

One of the things he had going for him is he had no criminal record as he indicated before. Mr. Brimmer had no criminal record of any kind. He was approximately forty-three years old at the time he was arrested. So he would not have been impeached by any criminal offenses.

But the pitfalls was that he would have been cross, and was cross-examined by Charles Bo Bell of the Shelby County District Attorney General's Office, a seasoned veteran prosecutor, who's tried many, many cases and we told Mr. Brimmer that had he gone — but if he chooses to testify that he would be vigorously cross-examined. But his story always stood the same. He never wavered in his story and as long as he was able to get that out there that, you know, that testifying would have its pitfalls but we could get something out of it. And being that this was really a state of mind case, not really a factual dispute or an identity case, to get into Mr. Brimmer's state of mind it would be advantageous for him to testify.[29]

Defense counsel advised that he advised Brimmer that he had a right not to testify and that the jury would be instructed that it should draw no inferences from his silence.[30]

Defense counsel also conducted a voir dire examination of Brimmer at trial to make a record that he understood his rights.[31] Brimmer acknowledged that his attorney told him he had a right to testify or not testify, that he could not be forced to testify, that he had a constitutional right to remain silent, and that if he chose to exercise that right, the jury would be instructed not to

---

[29] Id. at 44-45; *see also* id. at 46 (explaining that the defense strategy was to humanize Brimmer and to show "that the victim in the case had done him wrong").

[30] Id. at 45-46.

[31] Trial Tr. 186-89, State v. Brimmer, No. 03-05597 (Shelby Cnty. Crim. Ct.), ECF No. 11-1.

draw any inferences or hold it against him.[32] Brimmer also understood that he had a right to testify on his own behalf and that if he did testify, he would be subject to cross-examination by the State.[33] Brimmer admitted that he had had many discussions with his attorney about whether to testify.[34] He stated that he wanted to testify and that it was "[m]y own choice."[35] He also stated as follows:

Q.   Is anybody forcing you or making you testify today?

A.   No, sir.

**Q.   Are you on any medication or drugs that would prevent you from understanding your rights?**

**A.   No, sir.**

Q.   Are you doing this voluntarily?

A.   Yes, sir.

Q.   Without coercion?

A.   That's right.[36]

The state courts also credited defense counsel's testimony that he was prepared for trial. Abeles testified that

[w]e were very prepared to try this case on the day of trial. I spent many hours not only preparing for this case, I came into the office all day on Saturday and

---

[32]   Id. at 186-87.

[33]   Id. at 187-88.

[34]   Id.

[35]   Id.

[36]   Id. at 189.

Sunday prior to that Monday trial setting. We had like I testified to earlier, I had three jail visits prior, the week prior to trial. And not only that, I had consulted with Ms. Mayne who is my co-counsel in this case as well as a number of other attorneys including appellate staff just bouncing off ideas. You know, in the weeks preceding trial you get closer to a first degree murder trial, thoughts tend to be racing in your head, different ideas. And so I spent a lot of time preparing this case, reviewing the file over and over again, looking at witness statements, investigations. I basically really concentrated a lot, especially in the two weeks leading up to trial but even preparing prior to trial doing investigations and things of that nature, we were really prepared to go to trial.[37]

Jennifer Ray, one of the witnesses Brimmer wanted, was the victim's daughter.[38] Abeles recalled that his investigator located Ray but "Ms. Ray indicated that she wanted nothing to do with the defense counsel. She wanted no, no way at all to, you know, be a witness. With that hostility I certainly was not going to call her as a witness on the defense's behalf."[39] Brimmer testified that his lawyer had told him that Ray did not want to testify on his behalf.[40]

Brimmer also wanted Ray's boyfriend, Kela Lee, to testify on his behalf.[41] Abeles had his investigator interview Lee:

---

[37]    Pet. for Post-Conviction Relief Hr'g Tr. 47, <u>Brimmer v. State</u>, No. P-26688 (Shelby Cnty. Crim. Ct.), ECF No. 11-2.

[38]    <u>Id.</u>

[39]    <u>Id.</u> at 48; *see also* <u>id.</u> ("Also the feeling from the investigator was that this is someone who is going to be very hostile to our position and would not be a good witness at all.").

[40]    <u>Id.</u> at 22, 23-24, 24-25, 34.

[41]    <u>Id.</u> at 22-23; *see also* <u>id.</u> at 50 (purpose of Lee's testimony).

My investigator did make two contacts, once in 2004
and again in 2005. I sent my investigator out to do an
initial interview and then as we got closer to trial I
sent my investigator out to talk to Mr. Lee sometime in
2005 just to reestablish contact and make sure his
statement was consistent with what he told us before. He
was going to provide us with some information as to the
on goings between Ms. Covin and Mr. Brimmer. So, yes, we
did have two interviews with him.[42]

Abeles testified that he attempted, unsuccessfully, to subpoena Lee

for trial:

I issued a subpoena for Mr. Lee at the last address that
he gave us on the very last investigation. The sheriff's
department was unable to get service on him. In an
attempt to get him to court I sent my investigator, who
is the same investigator during all these cases who had
interviewed him on two prior occasions, during the week
before trial to try to track him down and locate him, so.
Once the efforts to the sheriff's department had failed
and they could not get service on a subpoena and both of
those efforts came up with failure, we couldn't not get
serv — we couldn't find him to serve him to get him to
come court [sic].[43]

Abeles recalled that "[t]he testimony that we sought to get out of

Mr. Lee actually we were able to obtain through cross-examination

of at least the state's witnesses . . . ."[44] Additional information

was provided by Brimmer's brother, David Brimmer.[45] Abeles concluded

that "everything that Mr. Lee would have testified to was covered

as far as our theory of the case. And it simply would have been

---

[42]    Id. at 49.

[43]    Id.; see also id. at 49-50. ("He just became unreachable, I don't
know about uncooperative. We just couldn't get him, couldn't find him.").

[44]    Id. at 50-51.

[45]    Id. at 51.

cumulative."[46] He also testified that he told Brimmer that they were unable to locate Lee and that they could ask for a continuance but might not get one.[47] Abeles recalled that Brimmer "said that given the witness that we did have, that we did find Ms. Davis and his brother and he would testify that we were okay to go to trial, he was okay to go to trial without Mr. Lee."[48] Brimmer testified that his attorney told him they were unable to locate Lee for trial.[49]

The decision of the Tennessee Court of Criminal Appeals that Brimmer did not establish deficient performance or prejudice is fully supported by the record. Brimmer has not satisfied his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. The second issue is without merit and is DISMISSED.

### B.    Ineffective Assistance of Appellate Counsel (Claim 3)

In his third issue, Brimmer contends that his attorney on direct appeal rendered ineffective assistance, in violation of the Sixth Amendment. (ECF No. 1 at 8–9; ECF No. 1-1 at 8–10.) The issues Brimmer contends should have been raised on direct appeal are listed in his legal memorandum. (ECF No. 1-1 at 9.)

---

[46]    Id.

[47]    Id. at 51–52.

[48]    Id.

[49]    Id. at 25.

Brimmer raised a claim of ineffective assistance of appellate counsel in his post-conviction petition,[50] but, at the evidentiary hearing, post-conviction counsel stated that "[t]his hearing is going to be focusing on ineffective assistance of trial counsel. Originally the petition had mentioned appellate counsel, but this is going to focus on the pretrial and trial proceedings."[51] In response to a question by the post-conviction court, counsel stated that the appellate issues were "going to be withdrawn."[52] The post-conviction court's order denying relief stated that "[a]t the hearing for post conviction relief, Petitioner withdrew all issues except ineffective assistance of counsel . . . limited to the following grounds," all of which addressed the conduct of trial counsel.[53] Brimmer also did not address his claim of ineffective assistance of appellate counsel in his brief to the Tennessee Court of Criminal Appeals on the post-conviction appeal.[54]

In his Answer, Respondent contends that "[t]his claim was not raised on post-conviction review and thus is procedurally defaulted." (ECF No. 9 at 11.) As previously discussed, the claim

---

[50]     Pet. for Post-Conviction Relief at 20-28, <u>Brimmer v. State</u>, No. P-26688 (Shelby Cnty. Crim. Ct.), ECF No. 11-2; <i>see also</i> Am./Suppl. Pet. for Post-Conviction Relief at 3, <u>id.</u>, ECF No. 11-2.

[51]     Pet. for Post-Conviction Relief Hr'g Tr. at 5-6, <u>id.</u>, ECF No. 11-2.

[52]     <u>Id.</u> at 6.

[53]     Order Denying Pet. for Post-Conviction Relief at 2, <u>Brimmer v. State</u>, No. P-26688 (Shelby Cnty. Crim. Ct.), ECF No. 11-2.

[54]     Br. of Appellant, Leroy Brimmer, <u>Brimmer v. State</u>, No. W2008-00738-CCA-R3-PC (Tenn. Crim. App.), ECF No. 10-2.

was presented in the original and amended post-conviction petitions, but it was withdrawn at the evidentiary hearing. Thus, Brimmer did not exhaust the claim in state court and, because no further means exist to exhaust that claim, it is barred by procedural default.

In the motion filed on May 15, 2012, Brimmer argues that his procedural default of this claim should be excused in light of the Supreme Court's decision in <u>Martinez v. Ryan</u>, ___ U.S. ___, ___, 132 S. Ct. 1302, 1320, 182 L. Ed. 2d 272 (2012). (*See* ECF No. 17.) Although he does not explicitly say so, Brimmer presumably means to argue that his post-conviction attorney rendered ineffective assistance by choosing to waive the appellate counsel claims. Until recently, that argument would have been summarily rejected. "There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." <u>Coleman v. Thompson</u>, 501 U.S. at 752, 111 S. Ct. at 2566 (citations omitted).[55]

Since Respondent filed his Answer, the Supreme Court issued its decision in <u>Martinez</u>, ___ U.S. at ___, 132 S. Ct. at 1320, which recognized a narrow exception to the rule stated in <u>Coleman</u> "[w]here, under state law, claims of ineffective assistance of

---

[55]    *See also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

trial counsel must be raised in an initial-review collateral proceeding . . . ." In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." The Supreme Court also emphasized that "[t]he rule of <u>Coleman</u> governs in all but the limited circumstances recognized here. . . . It does not extend to attorney errors in other proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial . . . ." <u>Id.</u>, 132 S. Ct. at 1320.

<u>Martinez</u> involved a claim of ineffective assistance of trial counsel, and Brimmer is asking that that limited holding be expanded to include claims against appellate counsel. Brimmer's position is not persuasive. *See* <u>Moore v. Mitchell</u>, ___ F.3d ___, ___, 2013 WL 673524, at *13 (6th Cir. 2013) ("We respect <u>Martinez</u>'s emphasis that its conclusion was a narrow one and join our sister circuits in refusing to expand it."); *see also* <u>Banks v. Workman</u>, 692 F.3d 1133, 1148 (10th Cir. 2012) ("<u>Martinez</u> applies only to 'a prisoner's procedural default of a claim of ineffective assistance at *trial*,' not to claims of deficient performance of appellate counsel."); <u>Dansby v. Norris</u>, 682 F.3d 711, 729 (8th Cir. 2012) ("[T]he narrow exception of <u>Martinez</u> is limited to claims of ineffective assistance of *trial* counsel and does not extend to

alleged ineffectiveness of appellate counsel."), *pet. for cert. filed* (U.S. Feb. 4, 2013) (Nos. 12-8582, 12A510); <u>Landrum v. Anderson</u>, No. 1:96 CV 641, 2012 WL 3637365, at *5 (S.D. Ohio Aug. 22, 2012) ("Ineffective assistance by 26(B) counsel does not come within <u>Martinez</u> because 26(B) applications can raise only ineffective assistance of appellate counsel claims, not ineffective assistance of trial counsel claims.") (report and recommendation), *adopted*, 2012 WL 6022810 (S.D. Ohio Dec. 4, 2012).

Moreover, this is not a case in which post-conviction counsel negligently or inadvertently failed to raise an issue. Instead, post-conviction counsel deliberately waived an issue that had been presented both in the *pro se* post-conviction petition and in the amended and supplemental petition filed by counsel. Brimmer has not even attempted to argue that post-conviction counsel was ineffective.

The third issue is without merit and is DISMISSED.

Because every claim asserted by Petitioner is without merit, the Court DENIES the petition pursuant to 28 U.S.C. § 2254. The petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

## V.        APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003); <u>Bradley v.</u>

<u>Birkett</u>, 156 F. App'x 771, 772 (6th Cir. 2005). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Miller-El</u>, 537 U.S. at 336, 123 S. Ct. at 1039; *see also* <u>Henley v. Bell</u>, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. <u>Miller-El</u>, 537 U.S. at 337, 123 S. Ct. at 1039; <u>Caldwell v. Lewis</u>, 414 F. App'x 809, 814-15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. <u>Bradley</u>, 156 F. App'x at 773.

In this case, there can be no question that Petitioner's claims are meritless for the reasons previously stated. Because any

appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5). In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.[56]

IT IS SO ORDERED this 15th day of March, 2013.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

---

[56] If Petitioner files a notice of appeal, he must pay the full $455 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).